The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. We'll hear argument first in No. 19-2269, via Vadis, LLC v. Blizzard Entertainment, Inc., Mr. Danova. Thank you, Your Honor, and may it please the court. The principal issue presented to the court is whether the phrase pre-specified parameters is indefinite under Nautilus. The inventions in the 521 patent are directed to distributed computer networking and making data transfer in a distributed network more rapid, reliable, and the data more available. It does this in part by measuring certain pre-specified parameters. Mr. Danova, this is Judge Wallach. It seems to me that much of your argument deals with your belief that Blizzard, in its proposed constructions in inter partes review, basically conceded the case, as far as you're concerned, when it got to the trial. What Blizzard says in response is that, and I'm quoting from page 12 of the red brief, in their petition for inter partes review, Blizzard's proposed constructions did not necessarily reflect appropriate claim constructions to be used in litigation and other proceedings where a different claim construction standard applies. In fact, they said that, squarely said it, in their argument before the PTAB. Why were those different claim construction standards discussed by Via Vatus in the blue brief? Thank you, Judge Wallach. To respond to your first point, our principal argument is not based on their actions before the PTAB. As I hope to get into momentarily, every aspect of the intrinsic record, including the claims, the specification, and the prosecution history, support a very simple plain and ordinary meaning construction. Now, our position is that when they went to the PTAB, as this court decided and reaffirmed in the Samsung versus Prisla engineering case, you can seek an IPR review when claims are definite. The PTAB actually applies a more strict test for definite, it's called the Packard standard, in which claims have to be clear. As part of their gatekeeping function, they say that they apply a more strict standard than the Nautilus standard, which is applied by this court, which is they have to be reasonably clear. And so when the appellees approached the PTAB with their petition and with a duty of candor said that these claims are definite and are subject to IPR review in an effort to invalidate the claims. Mr. DeNova, this is Judge Chen. Did they in fact proclaim that these claims are definite in their IPR petition? They said yes, these claims are definite, and so therefore they are completely amenable to an IPR review based on our 102-103 concerns. I don't think they quite said it like that. I agree with you, Judge Chen. I think it was implicit in the fact that they know the rules that the regimen or the regime is set up for 102-103. Go to what those rules are. I mean, you referred to the Samsung opinion, and what actually happened in the Samsung opinion is that this court remanded the appeal of the IPR back to the board because the board refused to consider the patentability of certain claims due to a certain type of indefiniteness defect. And we said no, there are circumstances where you can, as a patent board in these IPR proceedings, go forward and do your 102-103 analysis in spite of your view that there is an indefiniteness problem. Am I misunderstanding the Samsung case? Well, perhaps I am, Your Honor. I'm reading from the case. It says, as such, the proper course for the board to follow if it cannot ascertain the scope of a claim with reasonable certainty for purposes of assessing patentability is to decline to institute the IPR. And so it's my understanding that that is the rule. Do you have page 1355 of the Samsung opinion? I do, Your Honor. Do you have step 3 at 1355? I do. Okay. You see subsection number 2? I do, Your Honor. But did you read this part of the opinion? I did. This IPXL type indefiniteness. Right. So this is the part that I'm recalling from, and I'm asking you to respond to because you seem to be taking a position this morning that there is no way, no how, that the patent board in an IPR can review claims if it believes that there are any indefiniteness problems. That's what I heard you say. Now I want you to talk about what this part of Samsung says, which to me reads that it contradicts what you just said. Perhaps my statement then was too broad. The IPXL decision, it relates to mixed method and apparatus, and the court here says that the validity of the challenge claims may be subject to question for IPXL type indefiniteness, but that's not what is present in this case. Right. So what you need to do is to try to explain what's the principle this court should take away from cases like Samsung and the recently issued Cochlear opinion to try to understand what are the kinds of circumstances where there can be an indefiniteness defect, and yet it's still appropriate for the patent board to move forward. Are you familiar with the Cochlear opinion? I am not, Your Honor. Okay. I mean, if you just want to take the position that only IPXL type indefiniteness problems are the only kinds of problems that can ever be considered in an IPR despite that defect, then fine, we can move on because you don't have more to say on it. Well, I would like, if I could, to get to the intrinsic record aspect of our argument, which I think is the principal portion of our argument under Nautilus. So, under the claim language, the claims, claim one and 30… The appellee is arguing that based on the specification, you can't determine when this determination is to be made. Could you address that? Absolutely, Your Honor. Well, first of all, the passage that they're referring to talks about the detection of pre-specified parameters. So, first of all, it doesn't even address or it's not directed to the limitation in question. It is directed to the detection of the pre-specified parameters. And so, the PTAB determined and that what is meant by pre-specified is, well, it was particularly pre-determined in that case, is in accordance, in advance, in accordance with the claimed purpose. And so, the passage that they're referring to, which is a preferred embodiment… …that that's not clear, right? That's correct. So, what's your answer? Well, first of all, the specification passage is not directed to a preference for pre-determined or pre-specified parameters. Mr. DeNovo, this is Judge Chen. Can you point this to the passage? When you say the passage, I don't know what passage you're referring to. This is a 27… Yes, Your Honor. For example, on page 26 of the red brief… I'm talking about the passage in the patent. Okay. There's several such passages. There is Appendix 101 at 339-47, where it is referred to as prior to the transmission of the data. There's Appendix 101 at 420-24, again, prior to transmission of the data. And in each of these cases, there are two things that are occurring. There is the specification of the parameter, and there is the measurement or detection of the parameter. And, of course, in order to detect or measure the parameter, one would expect that you would want to know what the parameter is that you were measuring or detecting. And so, these passages actually refer to a preferred embodiment, which is claimed, in which case the pre-specified parameter is detected prior to the transmission of the data. And so, Mr. De Novo, my understanding of the other side's argument is, as you point out, these certain passages at Column 3, Column 4, and Column 5 seem to be directed to preferred embodiments, and that these preferred embodiments talk about parameters that are specified prior to the transmission of the data. And because they're preferred embodiments, that suggests strongly that perhaps the claims aren't limited to just the preferred embodiments, and therefore maybe your claim is not limited to specifying the parameters prior to the transmission of data. And so, that, my understanding, is their argument about these passages, and you need to explain why that understanding of these passages, Column 3, Column 4, and Column 5, is incorrect, and that's the wrong way to think about them. Yes. And in that connection, focus particularly on Column 5, Line 2735. Very well. So, again, this column, Judge Dyke refers to, it is preferred that the determination of the pre-specified parameters occur prior to the transmission of the data. And so, here there has to be a specification, which, in order to accomplish the objectives of the claim, has to be specified in advance of transmission, and the determination of that parameter, the measurement of that parameter, also must be. And, of course, this court has said repeatedly, including in Adams Respiratory Therapeutics, that a claim construction that excludes the preferred embodiment is rarely, if ever, correct. That's not the concern. The concern is that perhaps the claim is, not only does it include your preferred embodiment, but it also includes something else, non-preferred embodiment, in which your parameters are specified perhaps during the data transmission, or maybe even after the data transmission. And that's their argument. And so, therefore, this claim becomes, the scope of it becomes very, very unclear very, very quickly because that kind of scope of the claim is not explained in the patent how that's even possible. Well, Your Honor, first of all, the term pre has a plain and ordinary meaning, which means prior. So, it's specified in advance. That's what the plain and ordinary meaning of the claim means, which, incidentally, is precisely what this court… Please deal with this passage in the specification. If this passage is read to say it is preferred that the determination be made prior to the transmission of the data, then, as Judge Chen says, that's just a preferred embodiment, and there could be other embodiments when the determination is made at another time, which creates, potentially, an indefiniteness problem. Well, first of all, Judge Dyke, again, this passage says nothing about pre-specified parameters, when that occurs. It says it is preferred that the determination occur prior to the transmission of the data. So, the fundamental premise that this passage even describes a preferred embodiment about the pre-specification is incorrect. It describes a preferred embodiment that the determination occurs. Moreover, patentees routinely describe things as preferred embodiments. This doesn't make claims indefinite when they claim the preferred embodiment. It simply says that the preferred embodiment is claimed and embodied in Claims 1 and 30, which is consistent with this court's jurisprudence. So, Mr. De Novo, can we go to the means plus function issue? Yes, Your Honor. I know that the district court agreed with you as to what the corresponding structure is for both the initial means for detecting pre-specified parameters of the data transmission between the data storage means and the computer unit, and then the second means for detecting. And what I'm trying to understand is, what is the actual structure that does the first means for detecting pre-specified parameters? So, I would say with respect to this, there are two different structures affirmatively disclosed, and then there's logarithmic structure provided. Let's start with the hardware structure first. What is the hardware structure for the first means for detecting? There are two structures that are provided, a timer and a counter. Okay, but they're measuring the same parameter, which is duration, right? A counter could be used as a timer, but it is also used for other things, such as an error rate or a fault rate in accordance with the language of the patent. Where does the specification talk about the counter being used for those purposes? Yes, Your Honor, I have that here. So, the counter at Appendix 112, Column 26, Lines 30 to 42, the counter is used. It says it's used to determine transmission duration, and optionally a timer is implemented. Okay, but you're not answering my question. I understand that it refers to measuring duration. You said it's used to measure something else, and I'm asking you where in the spec we find that reference to it being used to determine something else other than duration. All right, very well. At Column 3, Lines 39 to 47, the pre-specified parameters include the duration of transmission, the fault rate. And so, there's a number of instances where, and there's also the 521 Patent 631. I need a specific question about where does the specification talk about the use of the counter to determine anything other than duration? Okay, at Column 11, Lines 6 through 13, the counter counts a number of hops along the message path. And so, it generates what it calls a ticket number, and there is a continuous counter generated in the cell associated with the ticket number for what are pseudo-reliable messages. Mr. DeNovo, I'm looking for the word counter in Column 11. Can you point me to it? Yes, it's, um, well, let me pull the patent. So, the passage I'm looking for says, as long as the respective operation included in the message MSG. Yes, it's on Column 11, Line 12. And where does it say that the counter is doing something that acts as a parameter that is different from figuring out duration of transmission? So, what it does, in my understanding, is that it's, there is an increment of the ticket number for each hop along the path. But it talks about here, again, measuring duration by combining, combined by the sending time of the message, which is duration, right? Well, fault rate inherently has, any rate has a duration component, but it also has a fault component. So, the duration component would be the denominator, but the faults would be the numerator. Okay, but here it's the counters determining the time of the sending of the message, right? Well, it's combined by the sending time of the message and the sender's identification. Okay, is there any other place, just before we finish, is there any other place in the patent where you contend that the counter is being used to measure anything except timing or duration? Well, there's repeated references in the patent to fault rate. No, that's not my question. My question is, where does the patent describe using the counter to determine anything except duration or timing? Well, there's also a reference to an average duration. So, an average duration of transmission would require, in this case, would require the addition of the times divided by a number of counters. Of course, that's how averages are calculated. So, the counter is used in addition to... Is there anything else? Well, there is, of course, the pseudocode associated with the pseudo-reliable messages on columns 11 and 12, which provide very explicit... Are we still talking about the counter? Well, the counter is used in conjunction with the pseudo-reliable messages. Let me get back to my question about the means for detecting. Because I understood what you argued below and what the district court adopted. The means for detecting pre-specified parameters is a network of computers that performs a four-step algorithm. Is that right? Well, in addition to the... That is correct. That is, of course, under this court's jurisprudence, if it's a general-purpose computer or network of computers, one looks to algorithmic teaching. That's right, but I'm just trying to figure out what in that network of computers is the actual hardware. Is it... I mean, it's not the monitors. Which part of the computer are we referring to there? It's the processor. So, well, and a clock. So, it could be... Okay. And then, is that also true for your second means for detecting pre-specified parameters for data transmissions between said data storage means? Well, I think the notion of a timer or counter incorporates aspects of both hardware and software. Well, what I'm trying to understand is below, I believe you advocated and the district court adopted that the exact same stuff, hardware, software, algorithms, that are associated with the first means for detecting is identical to the second means for detecting. Is that right? That is what the court ruled and... Because that's what you argued for. That's correct, Your Honor. Okay. And now what I'm trying to figure out is in this claim, one, the second means, before it says second means, it actually says the data storage means comprising the second means for detecting pre-specified parameters. Yes. So, to me, that suggests or that requires that the second means, whatever it is, it's located in the data storage means. So, this is a distributed network that's disclosed. The client is a computer and under column eight, five to six, the client is a internet provider, personal computer or network computer. The storage means also have associated computer systems and at column 10, lines four to 10. Do you understand my concern though? I mean, you can't possibly refer to the entire network of computers as being the hardware for performing the second means for detecting when the claim itself is referring to the data storage means. I completely understand, Judge Ten, what you're saying. My point is that these are nodes on a distributed network, each of which is a computer. And so column 10, lines four to 10, points out that the storage means of other computer systems which are distributed over the computer system. So, the network has nodes and those may fill a role of client computer or data storage means, again, having associated clocks and processors that would perform the algorithm. And I would finally point out, I realize I'm over time, but this court in intellectual property development, note nine, and at least one case cited therein, say there's nothing wrong with having the same structure perform multiple functions. One could easily imagine a patent claim directed to a chair where the legs are attached to the seat. Well, are you telling me that it's the data storage means that's also performing the first means for detecting? Well, no, that's inconsistent with the claim, Your Honor, but my point is that they are general purposes. What hardware is performing the first means for detecting? Well, the hard computers. I believe that the processors in each individual computer. And in the context of a timer, it would also include a clock, either external or internal. This is a general purpose computer, and so our approach was to apply the algorithmic structure, which is set out in pseudocode in great detail in the patent specification. But in each case, we're not identifying any particular processor, but it has to be a processor associated with that which is claimed as the computer, or in the case of the second means, the data storage means. Okay, well, unless there are further questions, maybe we should hear from Mr. Kelly. Thank you, Your Honor. We'll give you two minutes for rebuttal, Mr. Danvo. Mr. Kelly? May it please the Court. Good morning, Your Honors. I'd like to begin just real quickly with the clock counter issue. There really can be no debate about this. Via Vadas told the District Court, and now I'm going to read from appendix page 340, quote, the patent discloses a counter, an optional timer, for the purposes of calculating transmission duration. That's what the clock and counter are for. They're not for anything else. And beyond what Via Vadas told the District Court, the patent itself makes that clear. And I will point briefly to column 26 of the patent, which is at page 112 of the record. Mr. Danvo reads from that column right around lines 33 plus that mentions the clock and the counter. But the next paragraph begins by saying, the evaluation of the data transmission performance with respect to the data transmission duration, however, is to be understood as an example only. So, the patent also makes crystal clear that the counter and the clock are used for one and only one purpose, and that's data transmission. Now, I'd like to circle back quickly to the language prior to the transmission of the data, which is relevant to the pre-specified language in the claim. So, Via Vadas focuses on this throughout their brief, and they put this down as the marker, the marker that determines whether the pre-specified limitation has been met. And, of course, that's the indefiniteness that the District Court focused on. There's no debate here that pre-specified is not a temporal limitation. The problem is we don't know the endpoint of that limitation. Wait a moment. Why? There's no dispute that it's a temporal limitation? You mean there's no dispute that at some point there has to be a measurement? Sure. Sure. That's what pre-specified means, that one thing happens before another thing. The issue the District Court had was that we don't know what the other thing is. And what Via Vadas is now telling this Court is that the other thing, that is, the point in time about which we have to decide if a parameter was, in fact, pre-specified, is the transmission of the data. They argue that it's prior to the transmission, right? That's right, Judge Dyke. Why isn't that correct? I mean, you have this language in Column 5 of the patent about the further it is to be preferred on Line 28. But that seems to me susceptible to two interpretations. One is that it's to be preferred that it be done before the transmission, or it's preferred that it be done using this kind of data determination prior to the transmission. Your Honor, I'd like to point something else out about the language prior to the transmission of the data, which I think will clarify why it's not relevant at all to this discussion. And we describe this in our brief at Page 27. That language that Your Honor has pointed to prior to the transmission of the data, that doesn't modify the pre-specified language. That modifies the language, quote, the duration of data processing operations of the individual data storage means prior to the transmission of the data. In other words, this patent is talking about various parameters. And when it lists those parameters, one is the duration of the transmission. Another example is the fault rate. And another example is the duration of data processing operations of the individual data storage means prior to the transmission of the data. Well, that also is probably subject to two different readings. I mean, one reading I agree is your reading, but another reading would be that all of these types of parameters are specified prior to the transmission of the data. And then when you step back and think about the entire goal of this patent and the purpose of the invention, it seems necessary or necessarily that all of these parameters have to be specified before you actually do your data transmission because the goal here is to optimize the speed and reliability of data transmission to a given client by redundantly storing the data in a lot of different locations. And then you use these rules, these parameters, to assess which of those data storage locations will most rapidly deliver the desired data to a given client. So, you've got to have those parameters on hand at the time you are doing your decision-making as to which storage location you're going to be accessing to deliver the data. So, when you read this entire patent and think about the context of what's going on here, of course all of these parameters have to be specified before you do the actual data transmission in order to use the parameters to make the choice and decision of which data storage location to access. So, why wouldn't we understand the term pre-specified to be parameters that are specified in advance of the data transmission? So, Your Honor, I understand where you're going with that and I understand the point of the invention. And the answer is that the connection between the transmission of the data in the language that we're talking about is not the transmission of the data that is detected for the purposes of the duration. In other words, in order to more efficiently download data from a storage means to a computer, you want to know the transmission of the data, the time it's going to take to do that. And obviously, if the claim is written in terms of detecting that time, it has to not only be pre-specified, but it has to be detected before that transmission. In other words, the transmission that they're talking about, the transmission Viavatis is talking about, has nothing to do with the transmission where the duration is detected. Because, of course, it would be irrelevant to detect the duration of the actual transmission when it's happening, because at that point it doesn't make any sense. So, to key off this pre-specified word on the transmission of the data that we're all focused on makes no sense whatsoever, because the transmission of the data that we're all focused on is sort of not related to the duration analysis that is being used by the system. And what I point the court to... I'm sorry. I'm not sure what you're getting at, because let me just tell you what's in my mind. What's in my mind is that these parameters are based on prior messages having been sent and figuring out what is the duration of those messages, those transmissions. And then now you know what that variable is, and then that's stored in the data storage cell. And so now we know, okay, it takes four milliseconds for this cell to transmit data to client X. And so we know that already, and so now we're going to look that up and figure out whether that amount of time is too slow or the fastest available compared to other cells that store this exact same piece of data. So, Your Honor, what the court's question does there is it disconnects the pre-specification with the actual data transfer that we're talking about, because I think the court referred to earlier data transfers. And that may be a fair way to read this, but of course, once you refer to earlier data transfers, you're no longer talking about the transmission of data that's used in the specification. More importantly, Your Honor, we still have the problem... Go ahead, finish. Okay, thanks, Judge Steich. More importantly, we still have the problem of knowing when that pre-specification has to occur. And let me try and give the court an example. The claim is written in terms of means for detecting pre-specified parameters. We don't know who or where that pre-specification occurs. For example, is it the computer programmer, the coder who designs the means, is the person at that point pre-specifying the parameters so that the means is able to detect them? Or is the means programmed to detect many parameters, and the means has some sort of functionality within it that, while it's detecting, pre-specifies which ones that it's going to be used? And there's even a third possibility. The third possibility is that the means actually detects all the parameters. It's detecting all of them. Mr. Kelly, what I don't understand is, why do we need to know any of that to figure out what the meaning of the pre-specified parameters is? I mean, if we know what the pre-specified parameter is, which is a parameter that's specified in advance of a data transmission, why isn't that sufficient for 112B purposes? Why do we need to know where this parameter came from or how it was calculated? You know, maybe those are other issues, whether it's enablement or written description or something else. But just for 112B purposes or 112 second purposes, we already know what the parameter is or what the definition of it is. And, I mean, I'm not aware of any case law that says you need to know all this other stuff about how it came to be or where it came from or what person or device actually ultimately generates the parameter. I mean, that's not recited in the claim, so I don't know why it's required here. You didn't cite a case that suggests we need that kind of detail recited in the claim. Your Honor, we see the closest case that the parties cite in their briefing is the IGT versus Valley Gaming for predetermined events. Right, Your Honor. And in that case, we have a simple if-then situation, right? A command is issued if something happens before it. So we know what the timing is. The command follows what happened before it. To go back to Your Honor's question about why we have to figure out the timing in this case precisely, it's because the word pre-specified is in the claim. I'm asking about how it gets made or what device or person makes it. I don't see why that needs to – that's now a requirement for definiteness. Your Honor, it's not a requirement for definiteness, but what it would be in this case is it would be a clue to tell us when this is determined. If it's pre-specified in order to create the means, then the person coding the means has to know what it is. If it's done by the means – Mr. Kelly, suppose this claim had said pre-specified parameters, paren, determined prior to the transmission of the data. Would the claim then be indefinite? Your Honor, I think it would because, again, the transmission of the data has nothing to do with when the parameters are pre-specified because the transmission of the data is something that happens at the very end of the entire process. So, of course, the claim has to do something before the very end of its process. The question is how early does it have to do it? They don't just have to be pre-specified at the point of the data transmission because if they're not specified, Your Honor, until the instantaneous moment before the data transmission, then the claim doesn't work anymore. Because, remember, they have to be pre-specified before they can be determined, and as Judge Chen described in how the court perceived the claim operating, they get determined before the data transmission of the claim. There are some pre-data transmissions that happen earlier in time. So, keying the pre-specification off the data transmission in Claim 1 makes no sense because that data transmission is not the data transmission where the parameters are measured. And the best example of that I can give you is at Appendix 31 where the district court outlined Zia Vadas' description of this function and the district court at Numeral 3 in the left side of the column said, determining or checking occurs periodically based on time intervals or subsequent specified actions. In other words, this determining is not something that is keyed off the data transmission. It's something that's keyed off of something else. Mr. Kelly, I want to move on to judicial estoppel as well as the means plus function issue. On judicial estoppel, even though you may have reserved in your IPR petition that just for purposes of BRI, you proposed a specific claim construction for these means for detecting limitations or the meaning of pre-specified parameters, but nevertheless, in order to trigger an IPR, you had to take the position that the claim term was amenable to construction. And now you're saying it's not amenable to construction. And so, why is it that you're allowed to do that? I understand that there are two different claim construction rubrics that are applied in the IPR context and then in district court. But if anything, at the patent board and at the PTO, as you know, the agency uses a standard for definiteness, which makes it easier to find indefiniteness. That less ambiguity is required to find something ambiguous. And so, under the circumstances, if it's good enough for the board and good enough for you to trigger an IPR challenge, why aren't you constrained to that position and precluded from advancing a conflicting position in district court? May I continue?  I have a couple of answers to that, Your Honor. One is that we never said it was definite. We just laid out a construction that was agnostic to timing, so we're not taking a position now that's inconsistent. But to go to the higher sort of policy level aspect of Your Honor's question, it's not that there's two standards of indefiniteness. BRI permits the agency to approach definiteness in a different way where they can make a prima facie case when a claim is unclear, but maybe not indefinite under Nautilus standards. That's what Packard explains. The problem here is not that the claim needs to be clear enough in both tribunals at once for the same purposes, but that the purposes are different. And this is what the Samson case refers to that Your Honor was asking Viovatis' counsel about. The question at the board is whether or not the claim can be construed for the purposes of applying the prior art. And the district court felt it could. And why can it be construed enough for purposes of doing an IPR when you're telling us now we have no idea when these parameters are getting specified and we don't know where they're coming from or who and how they're being developed. I mean, if you need to know all that information, then you likewise need all that information for purposes of applying prior art. Your Honor, the difference is that when you're trying to figure out if a claim is anticipated or rendered obvious, it doesn't matter if the boundary of the claim is fuzzy as long as you know that the prior art lands squarely within it. And that's exactly what happened in this case because the prior art that was applied by us in our petition, the Rabinovich reference, that reference had what we'll call the pre-specified parameters hardwired into it. It was an article written by a scientist who said, here's some parameters that should be looked at. And the article wrote out how it all worked. So when they were pre-specified, it was frankly irrelevant to that prior art question. That doesn't mean it's not irrelevant, or I should say that doesn't mean it's not relevant to an infringement action where we do have to know the outer boundaries of a claim, particularly when the claim is not being assessed against an academic article, but is being assessed against a functioning system. At that point, somebody alleging that system of infringement has to do a lot more lifting to determine exactly what the outer boundary of that claim is. And it frankly wasn't necessary at the PTAP. And I'm well over my time, so unless the court has more questions. I'm sorry. This is my fault. But let's assume for the moment we have to get to the means plus function question. Could you just speak to that really briefly? Just focusing on the second means for detecting and why in your view there's no corresponding structure in the specification. Sure. So two reasons. The first, of course, is that it doesn't have, even if it is the same structure, that's for the first means that structure doesn't perform the function because it only looks for one parameter. That's the counter timer argument, the counter clock argument. But the bigger argument also, Your Honor, is that it can't be the same structure. It can't be the same structure because there's nothing in the specification that links the structure they're talking about with parameters between storage means, which is what they have to have. And I think what Your Honor pointed out is another reason, which is the structure of this claim. It puts the means for detecting the pre-specified parameters, the first means, at sort of the outer level as one of the main components of the system. But the second means is a subcomponent of the storage means itself because it says the data storage means comprising a second means. So we have a means nested within a structure, which is within a system that alternatively includes another means. If the argument is that one means is doing both things, they need to do a lot more to explain that. And they've done nothing close to explain that here. And Your Honor, I would also point the court out, point out to the court that when the district court reached its decision on this, it changed the function of the means. The only way the district court was able to read the same means on both functions was by explicitly altering the function without explanation. And I would point the court to appendix page 31. Mr. Kelly, I think we're about out of time. Thank you. Thank you, Your Honor. Mr. Denova, we'll give you two minutes. Thank you, Judge Zayach, and I'll try to be brief. So first to address the criticism or argument that we don't know when the determination occurs because the data is sent on a recurring basis, this system by its nature is an iterative system, a distributed network. You're going to be measuring these parameters on an ongoing basis, as counsel for appellees read. And then for subsequent data transmissions, you will be applying these pre-specified parameters for that transmission because necessarily the dynamics of a distributed network change on a regular basis. And I would like to talk briefly about the IGT case, which Judge Chen raised. In that case, there was actually some confusion caused by an argument made during prosecution that predefined event was different than predetermined event. Mr. Denova, we're running out of time, and I'm particularly concerned about the means plus function limitation. Yes, Judge Chen. The function for the second means is detecting pre-specified parameters for data transmissions between said data storage means. So as I understand it, the parameters here are related to doing a data transmission from one data storage means to another data storage means. Is that correct? It is correct, Your Honor. Okay, so... Well, if I could... Is that what shifting redundantly stored data in Claim 30 also means? Transmitting data between said data storage means? I'd have to look more carefully at Claim 30 to see if it's... I assume because it's not expressed in means plus function language, it would be somewhat different, but I don't have a ready answer to the differences between that and Claim 1. I would simply say, again, that the data storage means are computer systems as set forth at 10.4.10. So I think we think of data storage means as simply storage devices, in this computer system, and in Figure 1, what is disclosed is distributed computers performing roles or functions on the distributed network. Okay, Mr. Danilo, I think we're out of time. Thank you. Thank you. Thank you, Mr. Kelly. The case is submitted. Thank you.